Rachel Sykes [11778]
**PEARSON BUTLER**
1802 S. Jordan Parkway, Suite 200
South Jordan, Utah 84095
(801) 495-4104
rachel@pearsonbutler.com

Jean S. Martin (pro hac vice forthcoming)
Francesca K. Burne (pro hac vice forthcoming)
**AYLSTOCK WITKIN**
**KREIS & OVERHOLTZ PLC**
18 E. Main Street, Suite 200
Pensacola, Florida 32502
(850) 202-1010
jmartin@awkolaw.com
fburne@awkolaw.com

*Counsel for Plaintiff and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | | |
|---|---|---|
| KATANYA HAMERSLEY, on behalf of herself and all others similarly situated, | : : : | Case No. |
| *Plaintiff,* | : : | **CLASS ACTION COMPLAINT** |
| v. | : : | **PROPOSED CLASS ACTION** |
| INSTRUCTURE, INC., KKR & CO, INC., and DRAGONEER INVESTMENT GROUP | : : | **DEMAND FOR JURY TRIAL** |
| *Defendants.* | : : | |

Plaintiff Katanya Hamersley ("Plaintiff"), on behalf of all others similarly situated, by and

through her undersigned counsel, brings this Class Action Complaint against Instructure, Inc.;

KKR & CO, Inc.; and Dragoneer Investment Group; ("Defendants") and alleges the following

upon information and belief based on and the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of all persons who entrusted Defendants with sensitive Personally Identifiable Information ("PII"[1] or "Private Information") that was impacted in a data breach that Defendants recently experienced (the "Data Breach" or the "Breach").

2.      Plaintiff's claims arise from Defendants' failure to properly secure and safeguard Private Information that was entrusted to it, and its accompanying responsibility to store and transfer that information.

3.      Defendant Instructure, Inc., is a web-based learning management system that provides services for schools. It is used by learning institutions, educators, and students to access and manage online course learning materials and communicate about skill development and learning achievement.

4.      Instructure's product is the Canvas Learning Management System ("Canvas LMS" or "Canvas").

5.      Canvas is used by nearly 9,000 schools across the country, and approximately 275 million people, including students, teachers, faculty, and staff at educational institutions across the

---

[1]Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

6. Defendant KKR & CO, Inc. ("KKR") is an investment firm whose private equity division alone has over 200 billion dollars of assets under management, including over 225 portfolio companies.

7. Defendant Dragoneer Investment Group LLC ("Dragoneer") is an investment firm that specializes in investments in technology companies.

8. In July 2024, it was announced that KKR and Dragoneer were going to acquire Instructure for approximately 4.8 billion dollars.

9. In a November 2024 Press Release announcing the completion of the acquisition, Instructure touted the role it would play in the company's aggressive growth strategy, which included a commitment from Instructure to broaden its platform and deliver $1 billion in revenue by 2028.[2] The Press Release quoted Instructure's CEO, who explained that partnering with KKR would help the company "scale our global reach at a faster pace."

10. On May 2, 2026, less than two years into the company's aggressive growth campaign, Instructure announced that it had been hacked and that cybercriminals had gained access to Canvas users' names, email addresses, and ID numbers, as well as the messages Canvas users sent on the platform.

11. Instructure's May 2 announcement claimed the incident had been contained.

12. On May 7, Instructure revealed that there had been additional unauthorized activity tied to the same incident.

---

[2] https://www.instructure.com/press-release/kkr-and-dragoneer-complete-acquisition-instructure

13.     The ransom group, ShinyHunters, has taken responsibility for both incidents and claimed it gained access to Defendants' network and acquired "275 million individuals data ranging from students, teachers, and other staff containing PII."[3]

14.     As detailed below, Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on its affirmative representations to Plaintiff and Class Members to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

15.     Defendants failed to take precautions designed to keep individuals' Private Information secure.

16.     Defendants owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendants solicited, collected, used, and derived a benefit from the Private Information, yet breached its duty by failing to implement or maintain adequate security practices.

17.     Defendants also failed to adequately inform Plaintiff and Class Members about the incident.

18.     The sensitive nature of the data exposed through the Data Breach signifies that Plaintiff and Class Members have suffered irreparable harm. Plaintiff and Class Members have lost the ability to control their Private Information and are subject to an increased risk of identity theft.

---

[3]https://www.bleepingcomputer.com/news/security/instructure-confirms-data-breach-shinyhunters-claims-attack/ (last visited May 4, 2026).

19.    Defendants, despite having the financial wherewithal and personnel necessary to prevent the Data Breach, nevertheless failed to use reasonable security procedures and practice appropriate to the nature of the sensitive, unencrypted information it maintained for Plaintiff and Class Members, causing the exposure of Plaintiff's and Class Members' Private Information.

20.    As a result of Defendants' inadequate digital security, Plaintiff's and Class Members' Private Information was exposed to criminals. Plaintiff and the Class Members have suffered and/or will suffer injuries including (1) financial losses caused by misuse of their Private Information; (2) the loss or diminished value of their Private Information as a result of the Data Breach; (3) lost time associated with detecting and preventing identity theft; and (4) theft of personal and financial information.

21.    Upon information and belief, Plaintiff's Private Information is available on the Dark Web as a result of the Data Breach.

22.    Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; and (iv) timely notify Plaintiff and Class Members of the Data Breach.

23.    Plaintiff brings this action individually and on behalf of a Nationwide Class of similarly situated individuals against Defendants for: negligence; negligence *per se*; unjust enrichment, breach of implied contract, and breach of confidence.

24.     Plaintiff seeks to remedy these harms and prevent any future data compromise on behalf of himself, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## PARTIES

25.     Plaintiff Katanya Hamersley is a citizen and resident of Pensacola, Florida.

26.     Defendant Instructure is a Delaware corporation with its headquarters and principal place of business located at 6330 South 3000 East, Suite 700, Salt Lake City, UT 84720.

27.     Defendant KKR is a Delaware corporation with its headquarters and principal place of business located at 30 Hudson Yards, New York, NY.

28.     Defendant Dragoneer is a Limited Liability Company whose principal place of business is located at 1 Letterman Drive, Building D, Suite M-500, San Francisco, California 94129.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100 and at least one member of the Class is a citizen of a different state that is diverse from Defendants' citizenship, namely Plaintiff, who is a citizen of Oregon. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

30.     This Court has personal jurisdiction over Defendants because Defendants are registered to do business and maintain their principal place of business in this District.

31.     Venue is proper in this Court because Defendants' principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.  Background on Defendants

32.     Defendant Instructure is a Utah-based learning management system that provides services to thousands of schools and millions of students across the country.

33.     Plaintiff and Class Members directly or indirectly provided her Private Information to Defendants in connection with the services Instructure provides.

34.     Upon information and belief, Defendants made promises and representations to individuals, including Plaintiff and Class Members, that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained, including through its privacy policy.[4]

35.     Plaintiff and Class Members directly or indirectly provided their Private Information to Instructure with the reasonable expectation and on the mutual understanding that Instructure would comply with its obligations to keep such information confidential and secure from unauthorized access.

---

[4]*See Product Privacy Notice*, Instructure, accessible at
https://www.instructure.com/policies/product-privacy-policy (last visited May 10, 2026)
(Hereinafter referred to as the "Privacy Policy").

36.     In the course of collecting Private Information from Plaintiff and Class Members, Instructure promised to provide confidentiality and adequate security for the data it collected from Plaintiff and Class Members through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.[5]

37.     As a result of collecting and storing the Private Information of Plaintiff and Class Members for its own financial benefit, Instructure had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and the Class Members' Private Information from disclosure to third parties.

## B. The Data Breach

38.     On April 29, 2026, Instructure detected unauthorized activity in Canvas, but the company did not announce anything to Canvas users or the public.

39.     On April 30, 2026, Instructure experienced a service interruption. Again, Instructure did not give any indication that its network had been compromised.

40.     On May 1, 2026, Instructure, for the first time, publicly announced that it was investigating a cybersecurity incident.

41.     On May 2, 2026, Instructure announced that the cybercriminals had gained access to Canvas and were able to use this access to exfiltrate the names, email addresses, and ID numbers of Canvas users, as well as the contents of messages users had sent on the Canvas platform.

42.     On or about May 3, 2026, ShinyHunters publicly claimed responsibility for breaching Instructure's network through a post on the dark web, and ShinyHunters listed 8,809 entities impacted by the breach, many of which are educational institutions. ShinyHunters

---

[5]*Id.*

threatened that unless Instructure paid the ransom, ShinyHunters would publish the information it had stolen. ShinyHunters' post indicated that the group had given a May 7 deadline for payment.

43.    On May 6, 2026, Instructure announced that Canvas was back to normal operation and Instructure said that "we are not seeing any ongoing unauthorized activity."

44.    On May 7, 2026, ShinyHunters struck again, rendering Canvas unusable for approximately 330 institutions and replacing pages on those institutions' Canvas platforms with a message stating that the group "has breached Instructure (again)" and adding "Instead of contacting us to resolve it they ignored us and did some "security patches.""

45.    Instructure's failure to timely notify Plaintiff and Class Members further exacerbates their circumstances because: (1) Instructure has failed to indicate whether it was able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Instructure continues to maintain is secure; (2) Instructure fails to state how the Breach itself occurred; (3) Instructure's failure to notify victims deprives victims of the earliest opportunity to take preventative measures to protect their Private Information. All of this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity and wide array of information compromised in this specific breach.

46.    Furthermore, Instructure's delay in notifying Plaintiff and Class Members of the Data Breach is in direct violation of Instructure's responsibilities under the data breach notification statute in Utah. *See* Utah Code § 13-44-202(2), which requires that the disclosure notification be made "in the most expedient time possible without unreasonable delay."

47.    Instructure failed to take precautions designed to keep individuals' Private Information secure.

48.    While Instructure sought to minimize the damage caused by the Data Breach, it cannot and has not denied that there was unauthorized access to the sensitive Private Information of Plaintiff and Class Members.

49.    Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

50.    Plaintiff further believes that the Private Information of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

## C. Data Breaches Are Preventable

51.    Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

52.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[6]

53.    To prevent and detect cyber-attacks, Defendants could and should have ensured that Instructure implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework

---

[6]How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited May 10, 2026).

(SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[7]

54.    To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have ensured that Instructure implemented, as recommended by the Microsoft Threat

---

[7] *Id.* at 3-4.

Protection Intelligence Team, measures such as securing internet-facing assets, thoroughly investigating and remediating alerts, including IT Pros in security discussions, building credential hygiene, and hardening infrastructure.

55.    Given that Instructure was storing the sensitive Private Information of Plaintiff and Class Members, Defendants could and should have ensured that Instructure implemented all of the above measures to prevent and detect cyberattacks.

56.    The occurrence of the Data Breach indicates that Instructure failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiff and Class Members.

### D. Instructure Acquires, Collects, and Stores Plaintiff's and Class Members' Private Information

57.    In connection with the services Instructure provides, Plaintiff and Class Members were required to directly or indirectly give their sensitive and confidential Private Information to Instructure.

58.    Instructure retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, Instructure would be unable to provide its services.

59.    By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Instructure assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

60.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Instructure to keep their Private

Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

61.     Instructure could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

62.     Upon information and belief, Instructure made promises to Plaintiff and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

63.     Instructure's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**E.  The Data Breach Was Foreseeable and the Defendants Was Aware of Its Risk**

64.     It is well known that Private Information are invaluable commodities and a frequent target of hackers.

65.     In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[8]

66.     Individuals place a high value not only on their Private Information, but also on the privacy of that data. For the individual, identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.

---

[8]*2024 Data Breach Report*, ITRC (Identity Theft Resource Center) (January 2025), *available at* https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited May 10, 2026).

67.     In light of recent high profile data breaches at other industry-leading companies, including, *e.g.*, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

68.     Instructure, in particular, knew or should have known that it could be targeted by cybercriminals, given that, in the two months preceding Instructure's own incidents, two other educational technology platforms were compromised, with ShinyHunters claiming responsibility for those incidents as well.

69.     In March 2026, ShinyHunters compromised Infinite Campus, a K-12 student information system used by 11 million students.

70.     In April 2026, ShinyHunters compromised the educational publisher McGraw-Hill, who confirmed that the data breach exposed the data of approximately 13.5 million accounts.

71.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

72.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

73. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Instructure's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

74. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

75. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

76. As an entity in possession of Plaintiff's and Class Members' Private Information, Instructure knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems and network were breached. This includes the significant costs imposed on Plaintiff and Class Members because of a breach. Nevertheless, Instructure failed to take adequate cybersecurity measures to prevent the Data Breach, and Defendants KKR and Dragoneer failed to ensure Instructure took adequate cybersecurity measures.

**F. Defendants Fails to Comply with FTC Guidelines**

77. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

78. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note

that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[9]

79.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[10]

80.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

81.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[9]*Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), https://ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited May 10, 2026).
[10]*Id.*

82.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information.

83.    Instructure failed to properly implement basic data security practices.

84.    Instructure's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

85.    Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of Plaintiff and Class Members; Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information Instructure obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class Members.

**G. Defendants Fail to Comply with Industry Standards**

86.    As noted above, experts studying cyber security routinely identify companies in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

87.    Several best practices have been identified that, at a minimum, should be implemented by companies, like Instructure, that are in possession of Private Information, including but not limited to: educating all employees; strong passwords; multi-layer security,

including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Instructure failed to follow these industry best practices, including a failure to implement multi-factor authentication.

88.    Other best cybersecurity practices that are standard include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Instructure failed to follow these cybersecurity best practices, including failure to train staff.

89.    Instructure failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

90.    These foregoing frameworks are existing and applicable industry standards for safeguarding data, and upon information and belief, Instructure failed to comply with at least one––or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**H.  Defendants Owed Plaintiff and Class Members a Duty to Safeguard their Private Information**

91.     In addition to its obligations under federal and state laws, Instructure owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Instructure owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements and its Privacy Policy, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

92.     Instructure owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its network and computer systems on how to adequately protect Private Information.

93.     Instructure owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

94.     Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**I.   The Harm Caused by the Data Breach Now and Going Forward**

95.     Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). When "identity thieves have your

personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[11]

96.    The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft.

97.    Plaintiff and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

98.    Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

99.    When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.[12]

100.    For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another

---

[11] *Prevention and Preparedness*, New York State Police, https://troopers.ny.gov/prevention-and-preparedness (last visited May 10, 2026).
[12] *Shining a Light on the Dark Web with Identity Monitoring*, IdentityForce (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited May 10, 2026).

person's identity."[13] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[14]

101.    PII remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[15] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

102.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[17]

103.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[18] Instructure did not rapidly report to Plaintiff and Class Members that their Private Information had been stolen.

104.    As a result of the Data Breach, the Private Information of Plaintiff and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiff and Class

---

[13] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/ (last visited May 10, 2026).
[14] *Id.*
[15] *Id.*
[16] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015) https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited May 10, 2026).
[17] *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020) https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited May 10, 2026).
[18] *Id.*

Members, or likely to be suffered as a direct result of Defendants' Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the imminent injury arising from potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to Defendants with the mutual understanding that Defendants would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of Instructure, and which is subject to further injurious breaches so long as Instructure fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

105.   In addition to a remedy for economic harm, Plaintiff and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

106.   Instructure disregarded the rights of Plaintiff and Class Members by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (b) failing to disclose that it did not have adequately robust security protocols and training practices in place to safeguard Plaintiff's and Class Members' Private Information; (c) failing to take standard and

reasonably available steps to prevent the Data Breach; and (d) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

107.    The actual and adverse effects to Plaintiff and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft and identity fraud directly or proximately caused by Defendants' wrongful actions and/or inaction and the resulting Data Breach require Plaintiff and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiff and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

### J.    Loss of Time to Mitigate the Risk of Identity Theft and Fraud

108.    As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

109.    Thus, due to the imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

110.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

111.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[19]

112.    Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[20]

113.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

**K.  Diminution of Value of Private Information**

---

[19]*See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited May 10, 2026).

[20]*See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited May 10, 2026).

114.    Private Information is valuable property.[21] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

115.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[22]

116.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[23] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[24] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[25]

117.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an

---

[21]*See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[22]*See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited May 10, 2026).

[23]https://latimes.com/business/story/2019-11-05/column-data-brokers (last visited May 4, 2026).

[24]https://datacoup.com/ (last visited May 10, 2026).

[25]https://www.thepennyhoarder.com/make-money/nielsen-panel/ (last visited May 10, 2026).

economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

118. The fraudulent activity resulting from the Data Breach may not come to light for years.

119. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

120. Defendants was, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network.

121. The injuries to Plaintiff and Class Members were directly and proximately caused by Instructure's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**L. The Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary**

122. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

123.   Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

124.   Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

125.   The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Instructure's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear, but for Instructure's failure to safeguard their Private Information.

**M. Loss of the Benefit of the Bargain**

126.   Furthermore, Instructure's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to provide their Private Information, Plaintiff and other reasonable Class Members understood and expected that they were, in part, exchanging their Private Information for Instructure's services and necessary data security to protect the Private Information when, in fact, Instructure did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Instructure.

*Plaintiff's Experience*

127. Upon information and belief, Instructure acquired and maintained Plaintiff's Private Information as part of its business practices and in connection with her school, Pensacola State College.

128. Plaintiff was required to provide Instructure with her Private Information to complete assignments and view her courses online.

129. Instructure was in possession of Plaintiff's Private Information before, during and after the Data Breach.

130. Plaintiff reasonably understood and expected that Defendants would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff would not have allowed Defendants, or anyone in Defendants' position, to maintain her Private Information if she believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

131. Plaintiff greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud that she is at an increased risk of experiencing, as a result of the Data Breach.

132. Plaintiff was notified of the Data Breach on May 7, 2026 and upon information and belief, is a Data Breach victim.

133. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants has yet to notify her of the relevant details about the Data Breach.

134.    Plaintiff anticipates spending time and money on an ongoing basis to try to mitigate and address harm caused by the Data Breach. In addition, Plaintiff will continue to be at a present and continued increased risk of identity theft and fraud for years to come.

135.    Plaintiff has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

136.    As a direct and traceable result of the Data Breach, Plaintiff suffered injury and damages after her Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring her accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess her Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of her Private Information, a form of intangible property that Defendants obtained from Plaintiff and (g) other economic and non-economic harm.

## CLASS ALLEGATIONS

137.    Plaintiff brings this class action, individually and on behalf of the class defined as:

> **Nationwide Class**: All persons residing in the United States who were impacted by Defendants' Data Breach (the "Class" or "Class Members").

138.    Specifically excluded from the Class are Defendants, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint

venturers, or entities controlled by Defendants, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

139. Plaintiff reserves the right to amend the Class definition above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

140. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

141. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Although the precise number of individuals is currently unknown to Plaintiff and exclusively in the possession of Defendants, upon information and belief, the Class is likely comprised of hundreds and possibly even thousands of Class Members. The Class is sufficiently numerous to warrant certification.

142. Typicality of Claims: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had her Private Information compromised as a result of the Data Breach. Plaintiff is a member of the Class, and her claims are typical of the claims of the members of the Class. The harm suffered by Plaintiff is similar to that suffered by all other Class Members which was caused by the same misconduct by Defendants.

143. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

144. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

145. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

   a. Whether Instructure failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

   b. Whether Instructure's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

   c. Whether Instructure's storage of Plaintiff's and Class Members' Private Information was done in a negligent manner;

   d. Whether Defendants had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

   e. Whether Defendants' conduct was negligent;

   f. Whether Defendants' conduct violated Plaintiff's and Class Members' privacy;

   g. Whether Defendants took sufficient steps to individuals' Private Information;

   h. Whether Defendants were unjustly enriched; and

   i. The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

146. Information concerning Defendants' policies is available from Defendants' records.

147.    Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

148.    The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

149.    Given that Instructure has not indicated any changes to its conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 149 as though fully set forth herein.

151.    Plaintiff brings this claim individually and on behalf of the Class Members.

152.    Instructure knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

153.    Defendants had a duty to ensure that Instructure had procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' Private Information.

154.    Instructure had, and continues to have, a duty to timely disclose that Plaintiff's and Class Members' Private Information within its possession was compromised and precisely the types of information that were compromised.

155.    Defendants owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

156.    Instructure's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and Plaintiff and Class Members.

157.    Defendants were in a position to ensure that Instructure's systems and networks were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

158.    Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Instructure is bound by industry standards and its own Privacy Policy to protect confidential Private Information.

159.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information.

160. The specific negligent acts and omissions committed by Instructure include, but are not limited to, the following:

  a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

  b. Failing to adequately monitor the security of its networks and systems; and

  c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards.

161. Instructure's negligent acts and omissions can be attributed to KKR and Dragoneer as well, given that the two acquired Instructure as part of an aggressive growth strategy that prioritized growth over adequate data security.

162. Instructure, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within Instructure's possession.

163. Instructure, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' Private Information.

164. Instructure, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the Private Information within Defendants' possession might have been compromised and precisely the type of information compromised.

165. Instructure breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Instructure, Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. § 45, Instructure failed to implement proper data security procedures to adequately and reasonably protect Plaintiff's and Class Members' Private Information. In violation of the FTC guidelines, inter alia, Instructure did

not protect the Private Information it keeps; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; lacked the requisite understanding of its networks' vulnerabilities; and failed to implement policies to correct security issues.

166.    It was foreseeable that Instructure's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

167.    It was foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in injuries to Plaintiff and Class Members.

168.    Defendants' breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised.

169.    But for Defendants' negligent conduct and breach of the above-described duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

170.    As a result of Defendants' negligence and breach of duties, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiff and Class Members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort,

and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

171.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 149 as though fully set forth herein.

172.   Section 5 of the FTC Act, 15 U.S.C. 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Instructure of failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information, and the unfair act or practice of KKR and Dragoneer in designing and implementing an aggressive growth strategy that contributed to the failure to implement the safeguards necessary at Instructure. Various FTC publications and orders also form the basis of Defendants' duty.

173.   Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with industry standards.

174.   Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Instructure's network and systems.

175.   Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

176.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

177.    As a result of Defendants' negligence per se, Plaintiff and Class Members have been harmed and have suffered damages including, but not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 149 as though fully set forth herein.

179.    Plaintiff and Class Members conferred a benefit upon Defendants by directly or indirectly providing Instructure with their Private Information.

180.    Defendants appreciated or had knowledge of the benefits conferred upon themselves by Plaintiff. Defendants also benefited from the receipt of Plaintiff's and Class Members' Private Information by Instructure.

181.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and the Class Members' Private Information because

Instructure failed to adequately protect their Private Information. Plaintiff and the proposed Class would not have directly or indirectly provided their Private Information to Instructure had they known Instructure would not adequately protect their Private Information.

182.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach it caused.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 149 as though fully set forth herein.

184.    Plaintiff and the Class directly or indirectly provided and entrusted their Private Information to Instructure. Plaintiff and the Class provided their Private Information to Instructure as part of Instructure's regular business practices and as a condition of completing assignments and viewing their courses online.

185.    In so doing, Plaintiff and the Class entered into implied contracts with Instructure by which Instructure agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen, in return for providing their Private Information to Instructure. Implied in these exchanges was a promise by Instructure to ensure that the Private Information of Plaintiff and Class Members in its possession was secure.

186.    Pursuant to these implied contracts, Plaintiff and Class Members directly or indirectly provided Instructure with their Private Information. In exchange, Instructure agreed to,

Plaintiff and the Class understood that Defendants would, among other things: (1) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' Private Information; and (2) protect Plaintiff's and Class Members' Private Information in compliance with federal and state laws and regulations and industry standards and in accordance with Instructure's own internal Privacy Policy.

187.    Implied in these exchanges was a promise by Instructure to ensure the Private Information of Plaintiff and Class Members in its possession was only used to provide the agreed-upon reasons, and that Instructure would take adequate measures to protect Plaintiff and Class Members' Private Information.

188.    A material term of this contract is a covenant by Instructure that it would take reasonable efforts to safeguard that information. Instructure breached this covenant by allowing Plaintiff and Class Members' Private Information to be accessed in the Data Breach.

189.    Indeed, implicit in the agreement between Instructure and Plaintiff and Class Members was the obligation that both parties would maintain information confidentially and securely.

190.    These exchanges constituted an agreement and meeting of the minds between the parties.

191.    When the parties entered into an agreement, mutual assent occurred. Plaintiff and Class Members would not have directly or indirectly disclosed their Private Information to Instructure but for Instructure requiring it in connection with the services Instructure provides. Conversely, Instructure presumably would not have taken Plaintiff and Class Members' Private Information if it did not need it in connection with the services it provides.

192. Instructure was therefore required to reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure and use.

193. Plaintiff and Class Members would not have entrusted their Private Information to Instructure in the absence of their implied contracts with Instructure and would have instead retained the opportunity to control their Private Information.

194. Instructure breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiff and Class Members' Private Information.

195. Instructure's failure to implement adequate measures to protect the Private Information of Plaintiff and Class Members violated the purpose of the agreement between the parties.

196. As a proximate and direct result of Instructure's breaches of its implied contracts with Plaintiff and Class Members, Plaintiff and the Class Members suffered damages as described in detail above.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and her counsel as Class Counsel;

(b) For an order declaring that Defendants' conduct violates the laws referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For damages in amounts to be determined by the Court and/or jury;

(e)  For an award of statutory damages or penalties to the extent available;

(f)  For pre-judgment interest on all amounts awarded;

(g)  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

(h)  For an order of restitution and all other forms of monetary relief; and

(i)  Such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury for any and all issues in this action so triable as of right.

Dated: May 11, 2026

Respectfully Submitted,

*/s/ Rachel L. Sykes*
Rachel Sykes [11778]
**PEARSON BUTLER**
1802 S. Jordan Parkway, Suite 200
South Jordan, Utah 84095
(801) 495-4104
rachel@pearsonbutler.com

Jean S. Martin (pro hac vice forthcoming)
Francesca K. Burne (pro hac vice forthcoming)
**AYLSTOCK WITKIN KREIS & OVERHOLTZ PLC**
18 E. Main Street, Suite 200
Pensacola, Florida 32502
(850) 202-1010
jmartin@awkolaw.com
fburne@awkolaw.com

*Counsel for Plaintiff and the Proposed Class*